**HEADNOTES:**

*Dale K. Byrd v. State of Maryland*, No. 682, September Term, 2018
Opinion by Salmon, J.

## <u>CRIMINAL LAW – DISCOVERY</u>

For *Brady v. Maryland* purposes, exculpatory evidence is evidence that goes to the heart of the defendant's guilt or innocence, while impeachment evidence is that which has the potential to alter the jury's assessment of the credibility of a significant prosecution witness.

## <u>CRIMINAL – DISCOVERY</u>

Prior to a defendant entering a guilty plea, a prosecutor has no duty to tell a defendant or the defendant's attorney about any evidence that would impeach a State's witness.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 682

September Term, 2018

_____

DALE K. BYRD

v.

STATE OF MARYLAND
_____

Wright,
Shaw Geter,
Salmon, James P.
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Salmon, J.
_____

Filed:  December 19, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The appellant, Dale K. Byrd ("Byrd"), on March 11, 2011, pleaded guilty, in the Circuit Court for Baltimore City, to possession of heroin with the intent to distribute in two separate cases. In the first case (No. 110085017), the State proffered to the plea judge that on March 19, 2010 Baltimore City police officers observed Byrd exchanging money for suspected drugs on the porch of a vacant house. Three gel caps of heroin were found on the porch of that house and seventy-five gel caps of heroin were found in another vacant house that Byrd was seen entering and exiting. In that case, Baltimore City Police Detective Daniel Hersl ("Hersl") was one of the observing officers and was also the officer who swore out the statement of charges that were filed against Byrd.

The second drug distribution case (No. 110235023) concerned Byrd's distribution of drugs about five months after the first incident. On that date, according to the State's proffer at the plea hearing, Byrd was observed by Baltimore City Police officer Thomas Wilson, ("Wilson"),[1] in the same block and at the same vacant house where Byrd had been seen exchanging money for suspected drugs in the first case. One gel cap of heroin was found on the porch of that house when it was searched.

Byrd, pursuant to an ABA plea agreement, agreed to plead guilty to two counts of possession with intent to distribute heroin; the court, in turn, agreed to sentence him to concurrent sentences of twelve years incarceration, with all but four years suspended in lieu of three years probation. After Byrd was questioned by the plea judge to make sure

---

[1] Officer Wilson was later promoted to Sergeant.

that the guilty plea was knowingly and voluntarily entered, the court accepted the plea and sentenced Byrd in accordance with the plea agreement.

On January 25, 2018, after he had completed his sentence and probation in the aforementioned two cases, Byrd filed a petition for writ of error coram nobis. The State filed an answer to the petition after which Byrd filed an amended coram nobis petition. A hearing on Byrd's amended petition was held on April 4, 2018.

At the coram nobis hearing, the major issue in dispute was whether Byrd had been denied a constitutional or fundamental right when he pled guilty to the aforementioned two heroin distribution charges. Byrd contended that there was such a denial because prior to the date that he entered the guilty pleas, the State failed to advise him of past dishonest conduct, in other cases, by Wilson and Hersl.

At the coram nobis hearing, Byrd's counsel introduced a February 9, 2018 Baltimore Sun article that stated that Wilson, in 2003, had given testimony in a federal case that the judge had not found to be credible. The newspaper article also related that in 2005, the Baltimore City Police Department's Internal Affairs Division recommended that Wilson be fired for allegedly entering and searching a home without a warrant, then getting a warrant after the fact, and falsifying paperwork to suggest that the warrant had been obtained before the search occurred. Regarding that incident, according to the Baltimore Sun article, a trial board found Wilson guilty of misconduct and neglect of duty and recommended a fifteen-day suspension without pay.

In regard to Hersl, counsel for Byrd argued that in the officer's internal affairs files there were findings, prior to Byrd's 2011 plea, indicating that he had made one or more false statements. The evidence in this regard was quite vague.[2]

Byrd, the only witness called at the coram nobis hearing, testified that his attorney did not "go over the [i]nternal [a]ffairs files" with him that concerned either Hersl or Wilson. He testified that he would have "found [it] significant" if his attorney had told him that "Wilson had [i]nternal [a]ffairs findings that related to dishonesty" or that Hersl "had sustained findings or negative findings for being dishonest or filing false paperwork[.]" He further testified that if he had known that Wilson and Hersl "both had honesty related findings or dishonesty findings" he would not have pled guilty on March 11, 2011. Byrd did not, however, claim that he was innocent of either of the charges to which he pled guilty.

At the coram nobis hearing, Byrd's lawyer argued that the contents of Wilson and Hersl's personnel files and/or their internal affairs files, undermined their credibility and that the State was obligated to give his client such impeaching information prior to Byrd's

_____

[2] Long after Byrd was convicted, Hersl was indicted and later convicted in federal court of being engaged in a criminal racketeering enterprise. The Baltimore Sun article said that Hersl had "amassed dozens of complaints" that resulted in the payment by Baltimore City of judgments in three civil suits against him. Whether any of the complaints involved a dishonest act or acts, and, if so, whether the dishonest acts occurred before Byrd's March 11, 2011 guilty pleas, is not shown in the record. The State, in its brief, argues that there was nothing whatsoever introduced into evidence at the coram nobis hearing that would show exactly what was in Hersl's personnel file or in his internal affairs files that concerned Hersl's honesty. The validity, *vel non*, of this argument is of no importance in this case because, even if we were to assume, *arguendo*, that, prior to the guilty plea, there was evidence in Hersl's personnel or internal affair files that would reflect adversely on his credibility, the outcome of this case would not change.

guilty pleas. Byrd's counsel maintained that because the impeaching evidence was not divulged, his plea was not made knowingly, voluntarily, or intelligently. The State contended, citing *United States v. Ruiz*, 536 U.S. 622, 629 (2002), that the right to impeachment information is a trial right, and does not have any bearing on whether a plea is made knowingly, intelligently or voluntarily.

After considering argument of counsel, Judge Charles H. Dorsey, III took the matter under advisement. On April 27, 2018, Judge Dorsey signed a "Memorandum Regarding Petition for Writ of Error Coram Nobis" in which he concluded that the case was controlled by *United States v. Ruiz*, which he interpreted as holding that the State, prior to the date that a defendant enters a guilty plea, is <u>not</u> required to disclose impeachment information to the defendant. Accordingly, in an order also signed on April 27, 2018, Judge Dorsey denied Byrd's petition for writ of error coram nobis.

In this appeal, Byrd, asserts:

> The Circuit Court erred in denying the Petition for Writ of Error Coram Nobis, where the State, prior to appellant pleading guilty, did not disclose material information concerning key police witnesses.

For the reasons set forth below, we shall affirm Judge Dorsey's denial of Byrd's petition for writ of error coram nobis.

## ANALYSIS

A petitioner who files for coram nobis relief, must satisfy five conditions:

> [1] "'the grounds for challenging the criminal conviction must be of a constitutional, jurisdictional, or fundamental character'"; [2] the petitioner has the burden to overcome the "'presumption of regularity'" in the criminal case; [3] "'the coram nobis petitioner must be suffering or facing significant

4

collateral consequences from the conviction'"[3]; [4] the issue must not be waived; and [5] there may be no other "'statutory or common law remedy [ ] then available.'"

*Hyman v. State*, 463 Md. 656, 672 (2019) (quoting *State v. Smith*, 443 Md. 572, 599 (2015)).

In this case we will presume, as Judge Dorsey did, that Byrd proved factors 2-5. The parties are at odds, however, as to whether Byrd satisfied factor 1.

Byrd claims that factor 1 was satisfied inasmuch as his counsel proffered evidence that showed that the State, by withholding impeaching evidence concerning past dishonest acts by Wilson and Hersl, violated Byrd's rights that were protected by the United States Constitution. Byrd relies primarily on *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny: *Brady v. United States*, 397 U.S. 742 (1970) and *United States v. Fisher*, 711 F.3d 460 (4th Cir. 2013).

*Brady v. Maryland* concerned John Brady, who was convicted by a jury of first-degree murder. The jury recommended that Brady receive the death penalty. 373 U.S. at 84. At Brady's trial, he admitted that he participated in the robbery of the murder victim but denied that he was the person who strangled and killed that victim. According to Brady's trial testimony, the actual murder was committed by his accomplice, Boblit. *Id.*

---

3 After Byrd completed his sentence in the subject cases, he was indicted in the United States District Court for Maryland for conspiracy to distribute more than five kilograms of cocaine. He pled guilty and entered into a plea agreement in which he would receive a sentence of a minimum of ten years but no more than fifteen years imprisonment. If Byrd could successfully convince the circuit court to grant him coram nobis relief and get the two convictions in the subject case set aside, it would markedly improve his chances of receiving a ten-year sentence in his pending federal case.

5

Prior to Brady's trial, his counsel was shown several statements made to the police by Boblit. But the prosecutor did not give Brady's counsel an unsigned statement by Boblit, dated July 9, 1958, in which Boblit admitted that he killed the victim.

Boblit's murder trial took place after Brady's conviction. At his trial, Boblit told the jury that the murder was committed by Brady. *See Brady v. State*, 222 Md. 442, 444 (1960).

Brady filed a post-conviction action claiming that his due process rights were violated by the State when it withheld the July 9, 1958 statement from his lawyer. Ultimately, the Maryland Court of Appeals reversed Brady's death penalty sentence and remanded the case for a new sentencing hearing on the grounds that the State's failure to provide Brady with Boblit's July 9 statement constituted a violation of the due process clause of the Fourteenth Amendment. 373 U.S. at 85-86. Because Brady had admitted at trial that he participated in the robbery that resulted in the victim's death, he was granted a new trial as to sentencing only because the evidence that was withheld could not have affected the jury's determination that Brady was guilty of first-degree murder of the felony murder variety.

In *Brady v. Maryland*, the Supreme Court affirmed the Maryland Court of Appeals, saying:

> We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

*Id.* at 87.

6

In interpreting *Brady v. Maryland*, it is important to remember that *Brady* dealt with what information must be given to the defendant to ensure a fair trial. *See United States v. Mathur*, 624 F.3d 498, 506-07 (1st Cir. 2010) ("The animating principle of *Brady* is the avoidance of an unfair trial. It is, therefore, universally acknowledged that the right memorialized in *Brady* is a trial right.") (quotation marks and citation omitted).

In a series of cases that followed *Brady v. Maryland*, the Supreme Court broadened the scope of the State's duty to provide the defendant, prior to trial, with impeaching and exculpatory information. In *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999), the Court held that the failure by the government to disclose evidence to the defense regardless of whether the defense requests the evidence violates the due process rights of a defendant where: (1) that evidence is "favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) the evidence was "suppressed by the state, either willfully or inadvertently"; and (3) "prejudice . . . ensued." *See also* 6 Wayne R. LaFave, § 24.3(b), at 421 (4th ed. 2015). For *Brady v. Maryland* purposes, exculpatory evidence is evidence that goes to the heart of the defendant's guilt or innocence, while impeachment evidence is that which has the potential to alter the jury's assessment of the credibility of a significant prosecution witness. *See United States v. Avellino*, 136 F.3d 249, 255 (2nd Cir. 1998).

The case of *Brady v. United States* dealt with the issue of whether Robert Brady's guilty plea was voluntary. 397 U.S. at 745. Robert Brady was charged in 1959 with kidnapping in violation of 18 U.S.C. § 1201(a). Because the indictment alleged that the kidnapping victim was not liberated unharmed, Brady faced a possible death sentence if a jury recommended such a sentence. *Id*. at 743. Under the statute, Brady would not face a

7

death penalty if he elected a judge trial. In other words, in order to ensure that he would not receive the death penalty, Brady would have to waive his right to a jury trial. *Id.* at 745-46. Brady, after learning that his co-defendant planned to plead guilty and was available to testify against him, elected to enter a guilty plea and was sentenced to 50 years imprisonment – later reduced to 30. *Id.* at 743-44.

Long after Brady's guilty plea was accepted, the Supreme Court in *United States v. Jackson*, 390 U.S. 570, 581-85 (1968), ruled that section 1201(a) was constitutional except for the death penalty provision. In regard to that penalty, the Supreme Court agreed with the trial court that the death penalty provision "imposes an impermissible burden upon the exercise of a constitutional right" because the death penalty applied only to those that elected to be tried by a jury, but not to those who elected a judge trial. *Id*. at 572.

Brady claimed that his guilty plea was not voluntary because the death penalty feature of § 1201(a) operated to cause him to plead guilty. More specifically, Brady contended that the *Jackson* decision required every guilty plea under that statute to be declared invalid, at least when the fear of death penalty is shown to have been a factor in entering the plea. 397 U.S. at 746. In *Brady v. United States*, the Court rejected that contention. *Id.* at 747.

In holding that Brady's plea was "voluntary" the Court quoted with approval the standard of voluntariness of guilty pleas set forth in a dissenting opinion written by Judge Tuttle in *Shelton v. United States*, 242 F.2d 101, 115 (5th Cir. 1957), where Judge Tuttle said:

8

[A] plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), <u>misrepresentation</u> (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).

397 U.S. at 755 (emphasis added).

In *Brady v. United States*, the Court went on to say:

Often the decision to plead guilty is heavily influenced by the defendant's appraisal of the prosecution's case against him and by the apparent likelihood of securing leniency should a guilty plea be offered and accepted. Considerations like these frequently present imponderable questions for which there are no certain answers; judgments may be made that in the light of later events seem improvident, although they were perfectly sensible at the time. The rule that a plea must be intelligently made to be valid does not require that a plea be vulnerable to later attack if the defendant did not correctly assess every relevant factor entering into his decision. <u>A defendant is not entitled to withdraw his plea merely because he discovers long after the plea has been accepted that his calculus misapprehended the quality of the State's case</u> or the likely penalties attached to alternative courses of action. More particularly, absent misrepresentation or other impermissible conduct by state agents, cf. *Von Moltke v. Gillies*, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948), a voluntary plea of guilty intelligently made in the light of the then applicable law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise.

*Id.* at 756-57 (emphasis added).

As will be discussed *infra*, Byrd claims that his guilty plea was induced by a material misrepresentation because "the State implicitly held out [Wilson and Hersl] as credible witnesses who were untarnished by findings to the contrary."

We turn next to a discussion of *United States v. Ruiz*, upon which the State places primary reliance. Angela Ruiz was arrested after immigration agents found 30 kilograms

9

of marijuana in her luggage. 536 U.S. at 625. Federal prosecutors offered Ms. Ruiz what was known as a "fast track" plea bargain, which required a defendant to waive indictment, trial and an appeal. *Id.* In return, under such a bargain, 'the [g]overnment agrees to recommend to the sentencing judge a two-level departure downward from the otherwise applicable United States Sentencing Guidelines sentence." *Id.* In Ms. Ruiz's case, such a departure would reduce her sentence range from 18 to 24 months to 12 to 18 months, i.e. a six month downward departure. *Id.* The fast track plea bargain would have required Ms. Ruiz to waive "the right to receive impeachment information relating to any informants or other witnesses as well as the right to receive information supporting any affirmative defense" the defendant might have if the case went to trial. *Id.* Ms. Ruiz refused to agree to the last-mentioned waiver. As a result, the government withdrew its offer and indicted Ms. Ruiz for unlawful drug possession. Later, despite the absence of any plea bargain agreement, Ms. Ruiz pleaded guilty to that charge. *Id.* at 625-26. At sentencing, the Court imposed a standard Guideline sentence and rejected Ms. Ruiz's request that she be granted the downward departure that the government would have recommended had she accepted the "fast track" agreement. *Id.* at 626

Ms. Ruiz appealed her sentence to the United States Court of Appeals for the Ninth Circuit. That Court vacated Ms. Ruiz's sentence on the grounds that, purportedly, the United States Constitution requires the government to make the same impeachment information available to the defendant prior to entering a guilty plea that they would have been required to make available if the defendant had gone to trial. *Id.* at 626. In *Ruiz,* the major issue decided by the Supreme Court was "whether the Fifth and Sixth Amendments

10

require federal prosecutors, before entering into a binding plea agreement with a criminal defendant, to disclose 'impeachment information relating to any informants or other witnesses.'" *Id.* at 625. The Court held "that the Constitution does not require that disclosure." *Id.*

In *Ruiz*, Justice Breyer, speaking for the Court, gave three reasons for that holding. The first reason was that under *Brady v. Maryland*, the right to receive "exculpatory impeachment material [is] a right that the Constitution provides as part of its basic 'fair trial' guarantee." *Id.* at 628. By contrast, when a defendant pleads guilty, that defendant "foregoes not only a fair trial but also other accompanying constitutional guarantees." *Id.* at 628-29. The Court went on to say:

> In this case, the Ninth Circuit in effect held that a guilty plea is not "voluntary" (and that the defendant could not, by pleading guilty, waive her right to a fair trial) unless the prosecutors first made the same disclosure of material impeachment information that the prosecutors would have had to make had the defendant insisted upon a trial. We must decide whether the Constitution requires that preguilty plea disclosure of impeachment information. We conclude that it does not.

*Id.* at 629.

After explaining that "impeachment information is special in relation to the *fairness of a trial* and <u>not</u> in respect to whether a plea is *voluntary* ('knowing,' 'intelligent,' and 'sufficient[ly] aware')," Justice Breyer made a statement that Justice Thomas focused upon in his concurring opinion, which is discussed *infra*. That statement by Justice Breyer was:

> It is particularly difficult to characterize impeachment information as critical information of which the defendant must always be aware <u>prior to pleading guilty</u> given the random way in which such information may, or may not, help a particular defendant. The degree of help that impeachment information can provide will depend upon the defendant's own independent

11

> knowledge of the prosecution's potential case—a matter that the Constitution does not require prosecutors to disclose.

*Id.* at 630 (emphasis added).

The second reason for the holding was that the Court could find no legal authority that would support the position of the Ninth Circuit. *Id*. at 630. To the contrary, the Court said that it had "found that the Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor." *Id*. (*citing Brady v. United States*, 397 U.S. at 757, where the defendant's guilty plea was upheld despite the fact that the defendant "misapprehended the quality of the State's case."). Additionally, the Court pointed out that the rule proposed by the Ninth Circuit, if adopted, "could seriously interfere with the Government's interest in securing those guilty pleas that are factually justified, desired by defendants, and help to secure the effective administration of justice." *Id.* at 631.

A third reason for the holding was:

> [D]ue process considerations, the very considerations that led this Court to find trial-related rights to exculpatory and impeachment information in *Brady* [*v. Maryland*] and *Giglio* [*v. United States*, 405 U.S. 150 (1972)] argue against the existence of the "right" that the Ninth Circuit found here. This Court has said that due process considerations include not only (1) the nature of the private interest at stake, but also (2) the value of the additional safeguard, and (3) the adverse impact of the requirement upon the Government's interests. *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Here, as we have just pointed out, the added value of the Ninth Circuit's "right" to a defendant is often limited, for it depends upon the defendant's independent awareness of the details of the Government's case. And in any case, as the proposed plea agreement at issue here specifies,

12

the Government will provide "any information establishing the factual innocence of the defendant" regardless. That fact, along with other guilty-plea safeguards, see Fed. Rule Crim. Proc. 11, diminishes the force of Ruiz's concern that, in the absence of impeachment information, innocent individuals, accused of crimes, will plead guilty. Cf. *McCarthy v. United States*, 394 U.S. 459, 465-467, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969) (discussing Rule 11's role in protecting a defendant's constitutional rights).

*Id*. at 631.

In his concurring opinion in *Ruiz*, Justice Thomas said:

I agree with the Court that the Constitution does not require the Government to disclose either affirmative defense information or impeachment information relating to informants or other witnesses before entering into a binding plea agreement with a criminal defendant. <u>The Court, however, suggests that the constitutional analysis turns in some part on the "degree of help" such information would provide to the defendant at the plea stage, . . . a distinction that is neither necessary nor accurate. To the extent that the Court is implicitly drawing a line based on a flawed characterization about the usefulness of certain types of information</u>, I can only concur in the judgment. The principle supporting *Brady* was "avoidance of an unfair trial to the accused." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). That concern is not implicated at the plea stage regardless.

*Id.* at 633-34.

Relying on what Justice Thomas said in his concurrence, appellant claims that Justice Breyer's opinion in *Ruiz* "recognizes that not all forms of impeachment evidence are created equal" and that "in rare circumstances, withholding impeachment evidence may invalidate a plea." Byrd contends that his is one of those rare cases.

With all due respect to Justice Thomas's concurring opinion, nothing in Justice Breyer's opinion can fairly be interpreted as suggesting that in some cases impeachment evidence that is of a great deal of help to the defendant, must be disclosed prior to the entry of a guilty plea. In fact, Justice Breyer said just the opposite, i.e., that one of the reasons

13

that the Court was <u>not</u> going to recognize the rule enunciated by the Ninth Circuit was that it is "difficult to characterize impeachment information as critical information of which the defendant must always be aware prior to pleading guilty given the random way in which such information may, or may not, help a particular defendant." *Id*. at 630. Moreover, Justice Breyer flatly said, for the Court, that the Constitution <u>does</u> <u>not</u> require a preguilty plea disclosure of impeachment information. *Id*. at 629.

Appellant also argues that "Maryland . . . has recognized that impeachment evidence may be especially significant even when it involves the conduct of witnesses in unrelated cases." In support of that assertion, appellant cites two Maryland cases dealing with petitions for actual innocence that were filed after the petitioner, post-trial, uncovered impeaching evidence involving State witnesses. The cases relied upon by Byrd are *State v. Hunt*, 443 Md. 238, 263-64 (2015) and *Snead v. State*, 224 Md. App. 99, 113 (2015). Both cases dealt with defendants who stood trial. It is, of course, true, as those cases pointed out, that in some cases newly discovered impeachment evidence concerning a <u>witness</u> <u>who</u> <u>testifies</u> <u>at</u> <u>trial</u> may be very important and may even constitute grounds for a new trial. And, under *Brady v. Maryland*, and its progeny, <u>if</u> a defendant goes to trial, then, prior to trial, the State is obliged to disclose to the defendant any impeachment evidence of which it is aware. This was recognized in *Ruiz*, 536 U.S. at 630. But we fail to see how that fact has any bearing on this case where Byrd never went to trial and, as the Court pointed out in *Ruiz*, *Brady v. Maryland* dealt with what information must be given to a defendant who goes to trial, and not what information a defendant must be given before he or she pleads guilty. *Id*. at 628.

14

For the above reasons, we reject appellant's argument that the *Ruiz* case, "when viewed in light of Maryland's recognition that impeachment evidence may be as material as exculpatory evidence, does not foreclose the possibility of a rare case in which the failure to disclose impeachment evidence could invalidate a plea."

Appellant makes a second and distinct argument, based on *Brady v. United States*, and *United States v. Fisher*, 711 F.3d 460 (4th Cir. 2013) as to why the circuit court erred in denying his petition for coram nobis relief. That argument is phrased as follows:

> The circuit [court] erred in denying the coram nobis petition because misrepresentations made by the State unduly influenced [a]ppellant's decision to plead guilty in both cases, thereby rendering the pleas invalid.

In support of that argument, appellant stresses that in *Brady v. United States*, 397 U.S. at 755, the Court stated that a guilty plea "induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes)" (emphasis added). As mentioned, Byrd claims that his guilty plea in the two cases were induced by material misrepresentations because "the State implicitly held out the officers as credible witnesses who were untarnished by findings to the contrary."[4] He relies on *United States v. Fisher* to bolster his position.

---

[4] Byrd does not claim that the prosecutor, prior to the guilty pleas in this case, knew that either Hersl or Wilson had credibility problems nor does he claim that the prosecutor was obliged to find out if such problems existed.

15

The *Fisher* case involved a corrupt police officer named Mark Lunsford. In 2007, Lunsford, a Baltimore City Drug Enforcement Agency Task Force Officer, applied for a warrant to search the residence of Cortez Fisher. 711 F.3d at 462. In his affidavit in support of the search warrant, Lunsford swore that he targeted Fisher after a confidential informant told him that Fisher distributed narcotics from his residence and vehicle and that a handgun could be found in his residence. *Id.* Lunsford's affidavit characterized the confidential informant as "reliable" and said that he was an individual "who had previously provided him with information that led to numerous arrests for narcotics violations." *Id.* His affidavit further stated that the confidential informant provided him with a physical description of Fisher, the make and model of Fisher's vehicle and its license plate number. *Id.* at 462-63. Lunsford's affidavit also declared that he subsequently conducted surveillance and saw Fisher make numerous narcotics transactions from his car after which Fisher returned to his residence. *Id.* at 463.

Solely on the basis of his affidavit, Lunsford obtained a search warrant for Fisher's residence and vehicle. When the search warrant was executed, police officers found crack cocaine and a loaded handgun.

Fisher was charged with one count of possession with intent to distribute cocaine and one count of possession of a firearm by a convicted felon. *Id.* Fisher subsequently pled guilty to possession of a firearm by a felon and was sentenced to 10 years in prison. *Id.*

In September 2009, Lunsford was charged with "various fraud and theft offenses related to his duties as a DEA officer, including falsely attributing information to a

16

confidential informant with whom he was splitting reward money." *Id*. Lunsford pled guilty to several such offenses and admitted to "falsely identifying a confidential informant on an affidavit supporting a wiretap application, an affidavit supporting a criminal complaint, and numerous investigation reports." *Id.* Regarding Fisher's case, "Lunsford admitted to the Federal Bureau of Investigation that the confidential informant he identified in his affidavit 'had no connection to the case' and that another individual was 'the real informant[.]'" *Id.* at 463.

After Lunsford entered his guilty plea in federal court, Fisher, by counsel, filed, *inter alia*, a motion to vacate judgment based on Lunsford's criminal misconduct. The district court denied Fisher's motion to vacate and Fisher filed an appeal to the United States Court of Appeals for the Fourth Circuit. On appeal, Fisher claimed that "Lunsford's underlying pre-plea misconduct rendered his plea involuntary" under *Brady v. Maryland* and *Brady v. United States*. *Id*. at 464. Two members of a three-judge panel held that Lunsford's misconduct rendered Defendant's plea involuntary. *Id*.

In reaching its decision, the majority opinion in *Fisher* relied heavily on *Ferrara v. United States*, 456 F.3d 278 (1ˢᵗ Cir. 2006). The *Fisher* Court, 711 F.3d at 465, quoting, in part from *Ferrara,* 456 F.3d at 290, said:

> [T]o set aside a plea as involuntary, a defendant who was fully aware of the direct consequences of the plea must show that (1) "some egregiously impermissible conduct (say, threats, *blatant misrepresentations*, or untoward blandishments by government agents) antedated the entry of his plea," and (2) "the misconduct influenced his decision to plead guilty or, put another way, that it was material to that choice."

The *Fisher* Court, again relying on *Ferrara*, continued:

17

But *Brady v. United States* does not limit government misrepresentations to prosecutorial promises designed to elicit a guilty plea. Consequently, the First Circuit has held that the government may not make "plain[ ]" and "inexcusabl[e]" misrepresentations not anchored to any permissible litigation strategy. *Ferrara*, 456 F.3d at 293. In *Ferrara*, for example, the government explicitly represented that the prosecution would satisfy its continuing duty to disclose all exculpatory evidence in a timely manner. *Id*. Not only did the government fail to disclose as promised, it explicitly misrepresented that it had either disclosed to the defendants all exculpatory information or notified them of the exculpatory evidence it refused to disclose. *Id*. The First Circuit held that the affirmative misstatements "plainly and inexcusably misrepresented the true state of affairs" and constituted "blatant misconduct" that was "sufficient to ground the petitioner's claim that his guilty plea was involuntary." *Id*. (citation omitted).

711 F.3d at 465 (footnote omitted).

In *Fisher*, the government admitted that if it had known of a false statement by Lunsford, it would have disclosed it. *Id*. at 467. The government also admitted that, if there had been such a disclosure, the defendant would likely have filed a motion to suppress and if the motion was successful, the prosecution's case would have collapsed. *Id*. The *Fisher* majority held that despite the good faith of the prosecution, because the "[d]efendant's misapprehension stems from an affirmative government misrepresentation that strikes at the integrity of the prosecution as a whole" the government's false information was sufficiently impermissible conduct to permit defendant to withdraw from his plea agreement. *Id*. at 466 (quotation marks and citation omitted). The majority characterized the case as an "extraordinary" one in which "the law enforcement officer responsible for the investigation that led to the defendant's arrest and guilty plea himself later pled guilty to having defrauded the justice system in connection with his duties as an officer." *Id*. at 462. The majority went on to say that the case presented "highly uncommon

18

circumstances in which gross police misconduct goes to the heart of the prosecution's case." *Id.* at 466.

The majority in *Fisher*, concluded its opinion by saying, among other things, the following:

> Given the totality of the circumstances of this case—a law enforcement officer intentionally lying in an affidavit that formed the sole basis for searching the defendant's home, where evidence forming the basis of the charge to which he pled guilty was found—Defendant's plea was involuntary and violated his due process rights. Under these egregious circumstances, Defendant was "deceived into making the plea, and the deception prevents his act from being a true action of volition." *Lassiter v. Turner*, 423 F.2d 897, 900 (4th Cir. 1970) (citation omitted). The district court therefore erred by denying Defendant's motion to vacate his plea under 28 U.S.C. § 2255, and we accordingly reverse.

> \* \* \*

> Finally, allowing a defendant's guilty plea to stand when a police officer intentionally lies in a search warrant affidavit undermines public confidence in our judicial system. "Whether to prosecute, issue a warrant, indict and convict are serious matters that are decided in large measure based on what a police officer relates. So when an officer does not tell the whole truth, public confidence in the fair administration of criminal justice inevitably is eroded." *United States v. Gribben*, 984 F.2d 47, 48 (2d Cir. 1993).

711 F.3d at 469-70 (footnote omitted).

Judge Agee, in his dissent in *Fisher*, opined that, to the extent that the defendant relied on *Brady v. Maryland*, such reliance was foreclosed by the *Ruiz* case, because the withheld evidence was not exculpatory but was merely impeaching. *Id.* at 470-71. But Judge Agee read the majority opinion as relying on *Brady v. United States*, which held that "misrepresentations" that induce a guilty plea may be grounds upon which to void a prior guilty plea. *Id.* at 471. In this regard Judge Agee pointed out that a close reading of *Brady*

19

*v. United States* "reflects the scope of the court's meaning was in fact strictly limited and referred only to false representations directly designed to induce a defendant to plead guilty." *Id.* at 475. In Judge Agee's words, "the Court's frame of reference in *Brady v. United States* did not encompass actions tangentially related to the plea process, like a warrant application months in advance of the defendant's guilty plea." *Id.* Judge Agee went on to say that "[e]ven the examples of misrepresentations and impermissible conduct provided by the Court [in *Brady v. United States*] ('unfulfilled or unfulfillable promises' and 'bribes') relate directly to prosecutorial actions specifically designed to elicit a plea of guilty." *Id.* (footnote omitted). In Judge Agee's view, Mr. Fisher could show no such prosecutorial actions.

Additionally, according to Judge Agee's dissenting opinion, *Ferrara v. United States*, was inapposite:

> Indeed, the case both Fisher and the majority utilize to bear most of the weight in support of his claim, the First Circuit's decision in *Ferrara v. United States*, 456 F.3d 278 (1st Cir.2006), is materially distinguishable from the case at bar and essentially discredits both Fisher's arguments and the majority opinion. In *Ferrara*, the court opined that "[u]nder limited circumstances . . . the prosecution's failure to disclose evidence may be sufficiently outrageous to constitute the sort of impermissible conduct that is needed to ground a challenge to the validity of a guilty plea." 456 F.3d at 291. In that case, however, the "outrageous" conduct consisted of "manipulate[ing]" a witness, and then "represent[ing] to the court and the defense that the witness was going to confirm [a] story" inculpating the defendant in a murder plot, when in fact the witness had provided the government with affirmative evidence of the defendant's innocence. *Id.* The government conduct at issue in *Ferrara* went directly to exculpatory evidence of the actual innocence of the defendant as the prosecution secreted witness testimony that the defendant did not commit the crime with which he was charged.

> *Ferrara* is fundamentally distinguishable on three significant levels from the case at bar. First, the defendant in *Ferrara* asserted that he was innocent of the offense to which he pled guilty. *See Ferrara v. United States*, 384 F.Supp.2d 384, 388 (D.Mass.2005) ("Ferrara informed the Probation Department that he had not been involved in the . . . murder, but pled guilty to those charges because he was in an 'untenable' position."). Fisher makes no such claim, essentially arguing that he deserves to withdraw his guilty plea because Lunsford did a bad thing. But even the majority opinion acknowledges that, after *Ruiz*, "courts have considered a defendant's factual innocence in determining whether the government's failure to disclose material evidence render[s] a guilty plea involuntary." *Ante* at 467.

*Id*. at 476 (emphasis added, footnote omitted).

The Court, in *Sawyer v. United States*, 279 F.Supp.3d 883 (D. Ariz. 2017), set aside a defendant's guilty plea and in doing so found the analysis by the majority opinion in *Fisher* to be persuasive. *Id*. at 888. That case involved a plea of guilty by Howard Sawyer to one count of assault on a Federal Officer. *Id*. at 884. Prior to Sawyer's guilty plea the government had represented to Sawyer that the federal agent who had been assaulted by Sawyer had suffered a permanent eye injury. Sawyer's sentencing was enhanced, very substantially, for inflicting permanent bodily harm on the agent. *Id.* After Sawyer was sentenced, he found out that the agent's eye injury was not permanent. On that basis Sawyer asked that the plea he entered be vacated because "he was actually innocent of the enhancement for bodily injury." *Id*. at 885. The government, in response, admitted that since the sentencing "it learned that a neuro-ophthalmologist had concluded . . . that the assault was likely *not* the cause of the victim's vision loss." *Id*. The parties then filed a Joint Amended Motion to Vacate, Set Aside, or Correct Sentence. The parties agreed, *inter*

21

*alia*: (1) that the sentence was unconstitutional because the plea was involuntary; and, (2) that the enhancement was based on false information, which made the sentence a violation of the Fifth Amendment. *Id.* The government also explained to the district court that the victim-agent had refused to provide any additional medical records even though it appeared that he had submitted to two additional follow-up appointments for eye examinations. *Id.* at 885-86.

The *Sawyer* Court, granted the motion to vacate Sawyer's sentence noting that the "crux of the matter is whether there was an affirmative misrepresentation as to the injury by the victim-agent, which was relayed to Sawyer through the Government . . . ." *Id.* at 887. The Court held that there was such a misrepresentation even though the prosecutor, at the time of the plea, "was not in possession of any incongruent information . . . ." *Id.* The Court explained its holding as follows:

> Sawyer's situation constitutes an unfulfilled and unfulfillable promise by the Government—that if the case went to trial, the Government would be able to prove that the victim-agent's injury was permanent and caused by Sawyer's assault. This promise was a gross mischaracterization of the case against Sawyer. Similar to *Fisher*, the false information provided by the victim-agent formed the entire basis for the enhancement of Sawyer's sentence. Without it, the Government's argument for enhancement would have disintegrated entirely. Moreover, the Government concedes that had it known about the misrepresentation, it would have extended a more favorable plea agreement. . . .
>
> The Court finds when pleading guilty, Sawyer relied on information from the Government—provided by the victim-agent—that has since been shown to be a material misrepresentation. This constituted an unfulfillable promise made by the Government. Sawyer's plea therefore was involuntary. Therefore, this Court will vacate Sawyer's sentence and reset the case for trial.

279 F.Supp.3d at 889.

22

For the purposes of this case we will assume that *Fisher* was correctly decided. But the reasoning set forth by the *Fisher* majority does not apply in a case like this one. First, the alleged misconduct on the part of the two police officers, Wilson and Hersl, had no relationship to the subject case. This stands in stark contrast to the situation in *Fisher* or *Sawyer* where the misconduct of the detective went to the heart of the prosecution's case. Second, as the *Fisher* Court pointed out, that case involved "highly uncommon circumstances" in which gross police misconduct occurred and the misconduct reflected on the "integrity of the prosecution as a whole." 711 F.3d at 466, 469 (quotation marks and citations omitted). The same is not true here. Byrd proved, at most, that Wilson and Hersl had in the past acted dishonestly, but that dishonesty did not reflect on Byrd's guilt or on the State's "prosecution as a whole." Third, and perhaps most important, there was no affirmative misrepresentation by the prosecution regarding the crimes to which Byrd pled guilty.

The cornerstone of Byrd's contention that this case should be controlled by *Fisher*, is that, prior to his guilty plea, the prosecutor "implicitly held out the officers as credible witnesses who were untarnished by findings to the contrary." Byrd presents no facts or argument to support the assertion that the prosecutor made an implicit representation and, as we shall explain, no implicit misrepresentation was made.

There is no indication that the prosecutor in this case knew, prior to the guilty pleas, that Wilson or Hersl had been dishonest in the past. And, even if the prosecutor knew that on some past occasion(s) they had committed one or more dishonest acts (not involving

23

the subject case), the prosecutor indisputably would have no duty prior to the guilty pleas to tell Byrd or his attorney what was known. This is what the *Ruiz* case held. 536 U.S. at 629. Because the prosecutor had no duty to divulge such impeaching evidence, there is no basis for the contention that the prosecutor "implicitly" vouched for the honesty of either Wilson or Hersl.

## CONCLUSION

In this case, Byrd, long after he pleaded guilty, realized that he may have misapprehended the quality of the State's case against him, but such misapprehension gave him no right to set aside his plea when, as here, he failed to prove any misrepresentation or other impermissible conduct by State agents that concerned his case. *Brady v. United States*, 397 U.S. at 758.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

24